## H. Rhodes *v.* G. Rhodes and others.

In general, the payment of the consideration, is not such a part performance of a parol agreement for the purchase of lands, as will relieve it from the operation of the statute of frauds.

But where the consideration consists of services to be rendered, which are of such a peculiar character, that it is impossible to estimate their value to the vendor by a pecuniary standard, and the vendor did not intend to measure them by such a standard; the performance of the services will entitle the vendee to a specific performance, notwithstanding the contract was by parol.

This was held of an agreement made between two brothers, who had always lived together and owned their property in common, by which the one having a family, agreed to provide for and take care of the other, who had no family, and who was subject to epileptic fits, during his life, in consideration that the former should have all the real and personal estate of the latter.

*Held* also, that the contract was so far certain and reasonable in its terms, that it ought to be enforced in equity.

Ithaca, September 23, 24, 25, 1845; February 18, 1846.

The bill in this cause was filed, February 7th, 1843, by Henry Rhodes against his brothers, George Rhodes and Jacob Rhodes, and two married sisters with their husbands. It set forth that by the will of their father, a farm of upwards of two hundred acres, situate in the town of Lansing, in the county of Tompkins, was devised to Henry Rhodes, and Andrew Rhodes, since deceased, as tenants in common. That they took the farm, and for several years, occupied it together, conducting it on joint account, and owning in common, all their stock, farming utensils, and other movables. That in 1828, Andrew, having become subject to severe and dangerous attacks of epilepsy, and thereby incapacitated from labor, as well as requiring constant and watchful care and attention; agreed with Henry, that the latter should provide for and attend to him during his life, and that Henry should have, as a compensation therefor, all of Andrew's real and personal property. At that period, Henry had a family; Andrew was unmarried, living in Henry's family, and so continued until his death. That in pursuance of this agreement, Henry and his family did attend to Andrew, and provide for him suitably and to his entire satisfaction, until his death in 1841;

and after the agreement, Henry took and retained the exclusive possession of the whole property.

The defendants as heirs at law of Andrew, claimed to inherit the undivided half of the farm, with all his brothers and sisters, and one of them, George Rhodes, commenced an action of eject-ment against Henry, for the recovery of his share.

The defendants in their answer, denied the agreement alleged in the bill, and insisted that if any agreement were ever made between Henry and Andrew, it was not in writing, and was void. A large number of witnesses was examined on both sides. The principal issue was upon the making of the agreement, and so much of the opinion as discussed this question, as well as the testimony bearing upon it, is omitted.

There had been a previous suit between the parties, relative to the personal property of Andrew Rhodes, which, with some other circumstances, will be found adverted to in the opinion.

*G. D. Beers* and *A. Dana*, for the complainant.

*S. B. Cushing*, for the defendants.

THE ASSISTANT VICE-CHANCELLOR.—In my view of this case, it turns almost exclusively upon the facts put in issue by the pleadings ; and the law applicable to those facts is free from difficulty. For the better understanding of the subject, I have again carefully read the whole of the voluminous testimony in-troduced, and I will now state my conclusions.

The bill sets forth a contract by which, in 1828, it was agreed between Andrew and Henry Rhodes, by parol, that Henry should attend to and provide for Andrew, during his life time, and as a compensation therefor, should have all of Andrew's real and personal property.

The inquiries which the pleadings present are ; first, was such a contract made; second, was it certain in its terms, and sufficiently reasonable to be upheld and enforced ; third, was it performed on the part of Henry Rhodes ; and fourth, was it such an agreement as equity will carry into execution, although it was not in writing ?

Rhodes v. Rhodes.

FIRST. Was such a contract made as is stated in the bill ?

(The court then examined the proofs in the case at great length, and in conclusion, said :)

After scrutinizing and weighing the testimony with all the care and attention of which I am capable, the result is a clear conviction, that such a contract was made between Andrew and Henry Rhodes, as is stated in the bill.

SECOND. I will inquire whether this contract was certain in its terms, and so far reasonable that it ought to be enforced.

It was sufficiently certain. On the one side, Henry was to attend to and provide for Andrew, during his life time ; on the other, Andrew agreed that Henry should have all Andrew's real and personal property. It was objected that the agreement made no provision, as to how the property was to be transferred. Such a provision was not necessary. If Henry and Andrew had joined in a contract with the witness, North, by which for $4000, he should have their farm on lot No. 72 in Lansing ; on payment of the price, Mr. North would have had no difficulty in compelling them to convey the farm to him in fee. He would have obtained all their title, but without any covenants. This in part anticipates another objection, that the contract leaves it in doubt, whether Henry was to have the whole farm, or merely the use or income of the farm and the other property. I think the language precludes any doubt upon that point. Henry was to have *all* the property, not the use of all of it, or its income, or any thing less than all.

The case of *German* v. *Macklin*, (6 Paige, 288, 292,) cited by the defendant's counsel, does not aid his clients. The chancellor objected to the contract there set up, that it was not alleged that the party agreed to maintain his mother for life, or for any other particular period in consideration, that she did or would agree to convey the whole premises to him ; which portions of the agreement, are in this case distinctly and fully stated. Nor is there any want of mutuality here. If Andrew had conveyed the property to Henry, in performance of his part of the agreement, this court would have compelled Henry to attend to and provide for Andrew, or to compensate him to the full extent of the property conveyed.

Rhodes v. Rhodes.

It would have been better for both, if they had made their contract in writing. But they were brothers, having perfect confidence in each other, which this whole case proves, was not misplaced; and they probably deemed any writing between them unnecessary, if not an imputation of want of good faith.

Next, was this agreement reasonable in its terms, or was it so inadequate and unequal, as to require the court to decline enforcing it specifically. It does not appear how much property Andrew had in 1828. His interest in this farm was worth about $2023, and probably his whole estate may be safely assumed to have been $2500. It was entirely uncertain how long he would live, or how much care and attention he might require. He might have been carried off in a fit, within a week; and then the contract would have been thought by most persons, as most grossly inadequate. On the other hand, he might have survived twenty years, and during a great portion of the time, have been a constant tax upon the kindness, assiduity and care, of Henry and his household. It is evident that in weighing the consideration of this agreement, regard must be had to both of these contingencies, and to the probability of the longest duration of life. As the event proved, he survived for nearly thirteen years.

Andrew, the owner of this property, conscious that he was laboring under an incurable disease, one that was frightful to all who came in contact with him, having no children, and no one so near to him in love and affection, as Henry, with whom he had always lived; desired to secure to himself an asylum for life, in Henry's family, with the just expectation, that he would receive from him and them, that care and attention, which enduring affection alone could bestow, and which money could not purchase. For this object he was willing to devote his whole property. Henry on his part, consented to give him this attention through life, and maintain him for his property. Probably no such bargain would have been made between Andrew and a stranger; nor is it probable that Henry for the same amount of property, would have agreed to take care of a stranger for life, who was laboring under the same disease that visited Andrew.

But I am sure no one who reads the testimony in this cause, can doubt for a moment, that the consideration which Henry ac-

Rhodes v. Rhodes.

tually made to Andrew for the property, was full, valuable and most ample. Before Henry assented to the arrangement, his brother Frederick had declined to take Andrew on the same terms. The character of the duty which Henry underwent, is shown by the fact, that their brother Jacob was so much affected by seeing a single fit of Andrew's, that he could not remain in the house, and would not return to it the same night. No witness was produced who would have taken care of Andrew, as Henry did, for all his property ; and few that could have been induced to do it, on any terms. For this service, requiring constant and unceasing watchfulness, harrowing to the mind, destructive to the peace and comfort of his family, and injurious to his own health ; no one can say that the compensation which Andrew contracted to make, was unreasonable or extravagant.

Much of the result might have been justly anticipated in 1828, when the contract was made. If it had proved far worse, Henry was bound to go through with it; and if Andrew's death had occurred much sooner, it would not with propriety have varied the estimate of the consideration for the contract. I am satisfied that the court ought not to withhold its aid on this ground, but should decree a specific performance.

THIRD. The performance of the agreement, on the part of Henry Rhodes, is not disputed or questioned. Nor has the tongue of envy or malice, so much as suggested, that it was not most fully and faithfully performed. Andrew himself manifested his estimate of this, and his deep sense of gratitude for the kindness of Henry and his family, in his conversation with one of the witnesses, several years before his death.

FOURTH. It remains to inquire whether equity will decree the performance of this parol agreement.

The defendants insist that if any contract be proved, it is void by the statute of frauds. It is questionable whether the allegation in their answer, that if there were any contract, " the same is utterly void," can be deemed a plea of the statute of frauds. But without stopping to look into that technical point, I think the circumstances of this case, take it out of the statute on well established principles.

It is settled that the payment of the consideration, will not in

general, be deemed such a part performance, as to relieve a parol contract from the operation of the statute. But the reason for this, viz. that in such a case the re-payment of the consideration, will place the parties in the same situation, in which they were before, shows that the rule applies to a monied consideration only. If the consideration for the contract, be labor and services, those may sometimes be estimated, and their value liquidated in money, so as measurably to make the vendee whole, on rescinding the contract. But in a case like this, where the services to be rendered were of such a peculiar character, that it is impossible to estimate their value to Andrew Rhodes, by any pecuniary standard, and where it is evident that he did not intend to measure them by any such standard; it is out of the power of any court, after the performance of the services, to restore Henry Rhodes, to the situation in which he was, before the contract was made, or to compensate him in damages. The case is clearly within the rule which governs courts of equity, in carrying parol agreements into effect, where possession has been taken, or monies laid out in improvements upon the land sold. (2 Story's Eq. Jur. § 759 to 761; *Lord Redesdale, in Clinan v. Cook,* 1 Sch. & Lef. 41.)

There is also the further ground here, that Henry Rhodes in pursuance of this agreement, went into possession of the share of Andrew, and made permanent and valuable improvements to a great extent; certainly to an extent which it would have been improvident for him to have incurred, if on Andrew's death, all his heirs were to become owners of his half of the farm.

On the hearing I was referred to an opinion of my predecessor, in a suit by the administrators of Andrew Rhodes against Henry Rhodes, decided in July, 1842, in which he came to the conclusion that the agreement in question here, was not proved. I entertain a profound respect for the learning, ability and fidelity of my much esteemed predecessor, and would gladly have had the benefit of his opinion to guide me, if not to control me in this case. But his decree is not alluded to in the pleadings or testimony, and I have been obliged to decide the case as if there had been no previous suit. I am not apprised as to the details of the testimony upon which Vice Chancellor Hoffman pro-

ceeded. And it was said at the hearing, that neither Frederick Rhodes or Mary Ludlow, two of the most important witnesses for Henry Rhodes, were examined in the former suit.

I have not considered the agreement of 1828, in respect to the personal property which Andrew then had, nor is it necessary that I should. I will venture to suggest however, that inasmuch as the contract might by the death of Andrew, have been fully performed within a year, it did not fall within the provision of the statute then in force, regulating parol contracts for services and works. (1 Rev. Laws, 78, § 11; *Lockwood* v. *Barnes*, 3 Hill, 128, and cases in the notes.)

There must be a decree declaring the validity of the contract, and directing the defendants to release and convey the land in question, to the complainant; and the ejectment suit commenced by George Rhodes is to be perpetually enjoined. Neither party is to recover costs against the other.

Decree accordingly.